RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0239p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 16-3440

MAQSOOD HAROON,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:15-cr-00020-1—Gregory L. Frost, District Judge.

Argued: October 5, 2017

Decided and Filed: October 26, 2017

Before: SUTTON, DONALD, and THAPAR, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Dennis C. Belli, Columbus, Ohio, for Appellant. C. Mitchell Hendy, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Dennis C. Belli, Columbus, Ohio, for Appellant. Jessica H. Kim, UNITED STATES ATTORNEY'S OFFICE, Columbus, Ohio, for Appellee.

_____

## OPINION

_____

SUTTON, Circuit Judge. A jury convicted Maqsood Haroon for "knowingly procur[ing]" his citizenship "contrary to law" by lying to immigration authorities about his prior marriage and two children from that marriage. We affirm.

I.

Born in Pakistan, Haroon came to the United States on a visitor's visa in September 2002.  Six months later, the visa expired and Haroon returned to Pakistan.  Upon his return, he married Farzeena Bano, and the couple gave birth to a son.  One week after welcoming their newborn, the couple divorced.

The next day, Haroon returned to the United States on another six-month visa.  Within two months of his arrival, Haroon married Amberly McVey, an American citizen.  McVey and Haroon filed a relative petition (I-130, G-325), which permitted Haroon to apply for permanent residence (I-485).  After a mandatory two-year probationary period, Haroon applied to have the conditions on his permanent residence removed (I-751) and attested that his application was "based on [his] marriage to a U.S. citizen." R. 42 at 81; R. 47-4 at 119.  While that application was pending, Haroon and McVey divorced, and soon after the government approved the application.  Haroon applied for naturalization (N-400) and became an American citizen.

At each stage of this process, Haroon did not tell the truth.  The relevant forms (G-325, I-485, I-751, and N-400) asked whether Haroon had any children or former wives.  On each form and in the interviews conducted after submitting them, Haroon denied ever marrying Bano and denied the existence of any children, even after returning to visit Bano in Pakistan during the two-year probationary period and even after Bano gave birth to their second son nine months later.  Haroon also attested on one form that he had never "given false or misleading information" or "lied to" a government official to obtain immigration benefits.  R. 42 at 86–88.

Only after the government granted Haroon's citizenship did it learn the truth.  Just one month after becoming a citizen, Haroon returned to Pakistan, where he remarried Bano.  He then flew back to the United States and filed relative petitions on behalf of his once-again wife, still-two sons, and seven other family members.  In those petitions, he disclosed for the first time his two children and his former marriage to Bano.

The discrepancies caught the attention of Homeland Security.  The government charged Haroon with "knowingly procur[ing]" his citizenship "contrary to law," 18 U.S.C. § 1425(a), by making false statements "with respect to a material fact" in "document[s] required by the

immigration laws," *id.* § 1546(a).   The jury convicted Haroon, and the court sentenced him to two years' probation and revoked his citizenship.

II.

*Jury Instructions.*  Haroon seeks a new trial on the ground that the court misinstructed the jury.  We disagree.

The government charged Haroon with "knowingly procur[ing]" his citizenship "contrary to law," *id.* § 1425(a), namely by making false statements "with respect to a material fact" in "document[s] required by the immigration laws," *id.* § 1546(a).  Consistent with this language, the judge instructed the jury that the government needed to prove that Haroon (i) knowingly (ii) misrepresented (iii) material facts and (iv) procured citizenship as a result.

That's just what the case law requires.  *Maslenjak v. United States*, 137 S. Ct. 1918 (2017), also dealt with a § 1425(a) charge, and it also concluded that these are the required elements of a jury charge.  *Maslenjak* required a knowing misrepresentation. *Id.* at 1922–24.  It required that the lies be "material"—that the defendant lied about facts that "would have mattered to an immigration official." *Id.* at 1923.  And it required causation—that the illegal act, lying, "played some role in [his] acquisition of citizenship." *Id.*  These instructions required what *Maslenjak* demanded.

*Maslenjak*, it is true, reversed a decision of our court, holding that the government need not prove materiality when relying on a false statement.  *See United States v. Maslenjak*, 821 F.3d 675, 682 (6th Cir. 2016).  But by a quirk of timing, that panel decision came down three months *after* Haroon's trial and thus did not affect the district court's jury instructions in this case.

Even so, Haroon complains that the district court's instruction did not do the job. Causation, the district court said, required the government to "prove facts that raise a fair inference that the material false statement, if disclosed, would have made the person ineligible." R. 43 at 100.  It then undercut that definition, says Haroon, with language stating that the government did not need to show that the false statement "would more likely than not have

produced an erroneous naturalization decision." *Id.* But there's nothing inconsistent about these instructions. A *fair inference* of ineligibility does not require proof of *actual* ineligibility.

*Sufficiency of the Evidence.* Haroon separately challenges the sufficiency of the evidence to support his conviction. Section 1425(a), as just shown, required the government to prove that Haroon (i) knowingly (ii) misrepresented (iii) material facts and (iv) procured his citizenship as a result. No one complains about the sufficiency of the proof to support three of those elements— that Haroon knowingly made false, material statements when he lied about his prior wife and his two children from that wife, and his prior false statements to the U.S. government.

The dispute turns on causation. Was the evidence showing that Haroon procured his citizenship through these lies "so lacking that [the case] should not have even been *submitted* to the jury"? *Burks v. United States*, 437 U.S. 1, 16 (1978). *Maslenjak* offers two helpful examples about how the government could show that Haroon's misrepresentations played a causal role in procuring citizenship. One is by showing that the misrepresented facts themselves were disqualifying. The other is by showing that the truth would have led to the discovery of disqualifying facts. 137 S. Ct. at 1928–29. Under either theory, reasonable jurors could find that the evidence supports Haroon's conviction.

Some of the facts that Haroon misrepresented "are themselves disqualifying" for citizenship. *Id.* at 1928. In his naturalization application, Haroon was asked:

> 23. Have you ever given false or misleading information to any U.S. Government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal?
>
> 24. Have you ever lied to any U.S. Government official to gain entry or admission into the United States?

R. 47-5 at 8. Under penalty of perjury, he answered "No" to both questions. *Id.* at 8, 10. In his face-to-face interview, also under penalty of perjury, he stood by those answers. *Id.*

These misrepresented facts automatically disqualified Haroon. An applicant who gives "false testimony" for the purpose of obtaining immigration benefits does not have "good moral character." 8 U.S.C. § 1101(f)(6). And good moral character is a requirement for naturalization.

*Id.* § 1427(a).   Haroon thus "misrepresent[ed] facts that the law deems incompatible with citizenship." *Maslenjak*, 137 S. Ct. at 1928.

Perhaps one might worry that this analysis runs circles around *Maslenjak* by suggesting that any lie, no matter how minor, becomes material once packaged as a "false statement" going to the applicant's moral character.   But these lies were not minor or unrelated to his naturalization application.   True to form, they "must have played a role in . . . naturalization." *Id.* at 1929.   Lies about prior false testimony given for the purpose of obtaining immigration benefits (8 U.S.C. § 1101(f)(6)), just like lies about a prior aggravated felony conviction (8 U.S.C. § 1101(f)(8)), reveal a lack of good moral character.   *See id.* at 1926–28.   The government needed to prove that the predicate lie supporting the § 1425(a) violation had some influence on the naturalization decision.   It did just that.

Haroon does not contest that his statements were "made with the subjective intent of obtaining immigration benefits." *Kungys v. United States*, 485 U.S. 759, 780 (1988).   He instead insists that his *written* responses do not qualify as false testimony under § 1101(f)(6).   Maybe so. But *oral* statements, made during an interview with an officer authorized "to administer oaths" and "to take testimony concerning any matter . . . affecting" naturalization, *do* qualify as false testimony.   8 U.S.C. § 1446(b); *see Ruiz-Del-Cid v. Holder*, 765 F.3d 635, 638 (6th Cir. 2014); *In re R-S-J-*, 22 I. & N. Dec. 863, 865–66 (BIA 1999).   Ample evidence showed that Haroon orally ratified his written responses.   One witness testified that Haroon had a face-to-face interview.   Another, whose "duty is to interview applicants," explained that he normally "place[s] [the applicant] under oath," then asks questions by "go[ing] through the form that [the applicant] filled out."   R. 43 at 32–33.   Handwritten notes on Haroon's N-400 form bolster the inference that he was asked about prior misstatements in a section of the form titled "Good Moral Character."   R. 43 at 44, 63; R. 47-5 at 8; *Bernal v. INS*, 154 F.3d 1020, 1022–23 (9th Cir. 1998).

In addition, some of the facts that Haroon misrepresented during the naturalization process "could have led to the discovery" of other disqualifying facts.   137 S. Ct. at 1929 (quotation omitted).   In every one of his filings before acquiring citizenship—the G-325, I-485, I-751, and N-400—and in his interviews with immigration officers, Haroon lied about being

married to Bano or fathering any children with her back in Pakistan. The forms asked whether he had any children or former wives, and he consistently (and falsely) answered "None" or "0." *See* R. 47-1 at 1; R. 47-2 at 2; R. 47-4 at 122; R. 47-5 at 6. Haroon swore that he had been married just once, to Amberly McVey.

These lies, it is true, did not automatically disqualify Haroon. Divorcees and parents may apply for citizenship. But the misrepresented facts were "sufficiently relevant" to immigration requirements that they "would have prompted reasonable officials . . . to undertake further investigation." 137 S. Ct. at 1929. An application for permanent residence must be supported by an employment relationship or familial relationship. Haroon did not have the former. So it mattered whether he had the latter. If Haroon did not have a genuine familial relationship in the United States, either because he remained married to Bano or because he did not marry McVey in good faith, his path to citizenship would have been barred at the first filing.

Further investigation "would predictably have disclosed some legal disqualification." *Id.* at 1929 (quotation omitted). It might have revealed conduct (besides lying) that stripped Haroon of "good moral character." *See* 8 U.S.C. § 1101(f). DHS regulations enumerate several reasons that an applicant "*shall* be found to lack good moral character." 8 C.F.R. § 316.10(b) (emphasis added). If Haroon never really divorced Bano before marrying McVey, then he may have practiced polygamy. *Id.* § 316.10(b)(2)(ix). If he did divorce Bano, married McVey, and then returned to Pakistan to have a child with Bano, then he had an extramarital affair. *Id.* § 316.10(b)(3)(ii). In either setting, he would have had a problem. Lacking good moral character remains "a disqualifying fact." 137 S. Ct. at 1929.

On top of that, the investigation could have revealed that Haroon engaged in marriage fraud by "knowingly enter[ing] into a marriage for the purpose of evading any provision of the immigration laws." 8 U.S.C. § 1325(c). The timeline of Haroon's travels between Pakistan and the United States by itself raised red flags. But the details of Haroon's relationship with McVey are stranger still. Soon after marrying, Haroon and McVey stopped living together. And in 2005 and 2006, they had children with other people. They nevertheless maintained joint tax returns, rental agreements, insurance payments, and utility bills through 2008, when Haroon applied to

have the conditions on his permanent residence removed. A few months later, the couple divorced.

Even Haroon's immigration lawyer admitted that these facts looked suspicious. It is highly likely that a reasonable immigration official, having this set of facts before her, would have found them disqualifying and rejected Haroon's application. *See Maslenjak*, 137 S. Ct. at 1928; *Agyei v. Holder*, 729 F.3d 6, 16 (1st Cir. 2013); *Restrepo v. Holder*, 676 F.3d 10, 15–17 (1st Cir. 2012) (no "good moral character insofar as it [appeared] that [he] had engaged in a sham divorce" and gave "false testimony . . . regarding the reasons behind the[] divorce").

Haroon insists that we do not know whether his lies influenced the naturalization decision and that the government has not yet proved that his marriage to McVey was a sham. But *Maslenjak* says that § 1425(a) does not demand "proof positive that a disqualifying fact would have been found." 137 S. Ct. at 1930. It requires the government to show only that investigation would predictably have led to facts that justify denying naturalization. *Id.* at 1923. That's because "the defendant—not the Government—bears the blame" for making it difficult to prove, often years later, what "disqualifying fruit" the truth would have produced. *Id.* at 1929.

*Admission of Testimony.* Haroon separately argues that the trial court incorrectly permitted the government's witnesses to speak to the ultimate issue of law by saying how they might have ruled on Haroon's application if they had known the truth. We disagree.

The central inquiry under § 1425(a) is "how knowledge of the real facts would have affected a reasonable government official." *Id.* at 1928. Witnesses for the government may testify that information would have affected a reasonable officer's naturalization decision. *See id.* And witnesses for the defendant may testify to the opposite effect. *See id.* at 1930. The jury then permissibly decides whom to believe.

That's what happened here. The government's witnesses testified that Haroon's citizenship application would have been denied once the truth came out. But Haroon's counsel won concessions from them on cross-examination. Both witnesses admitted that they were not attorneys. And one of them conceded that immigration officials exercise discretion in approving or rejecting applications, sometimes approving applications with misstatements, and sometimes

disagreeing with each other about whether to grant an application "under the same set of circumstances." R. 43 at 45–49. Testimony on the "ultimate issue" did as much to help Haroon's cause as to hurt it. The only witness who had a special claim to knowledge of the law was Haroon's immigration lawyer, and he testified to the same issues as the government's witnesses. No reversible error occurred.

*Prosecutorial Misconduct.* In arguing that the prosecutor engaged in misconduct, Haroon points to a question that the prosecutor asked his immigration attorney: "Were you aware that Ms. McVey moved out of [their shared apartment] in the spring of 2005?" R. 42 at 185. This question made the trial unfair, he claims, because it led the jury to believe that his marriage to McVey was a sham. No misconduct occurred.

To prevail on this claim, Haroon has to show that the prosecutor's "comments so infected the [whole] trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quotation omitted). In context, the prosecutor's question responded to the witness's claim that Haroon and McVey's joint lease agreements showed that they still lived together in 2008. Even if that were not the case, the alleged misconduct was "confined to a single instance." *Berger v. United States*, 295 U.S. 78, 89 (1935). No reversible error occurred. *See Stewart v. Trierweiler*, 867 F.3d 633, 640–41 (6th Cir. 2017).

We affirm.